IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THURMAN SPENCER, JR.,                       \*

              Petitioner,
     v.                                      \*  CIVIL ACTION NO. RWT-11-2395

BOBBY SHEARIN, et al.,                   \*

              Respondents.
                                            \*\*\*

**MEMORANDUM OPINION**

A Response to the above-captioned Petition for Writ of Habeas Corpus, along with exhibits and the Petitioner's Reply, have been filed. The matter is now ready for dispositive review. The Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*; Local Rule 105.6 (D. Md. 2011); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). For the reasons that follow, the Petition will be denied and dismissed with prejudice, and a Certificate of Appealability will not be issued.

**Factual and Procedural History**

Petitioner was charged and convicted, after a jury trial, of first-degree rape, armed robbery, burglary, and a related handgun offense in the Circuit Court for Baltimore County. ECF No. 14, Ex. 1. The facts developed at trial, as recounted by the Court of Special Appeals of Maryland, are as follows:

> On October 15, 1998, Ontay Hill was living with his girlfriend, Melanie M., in an apartment at 121 Willow Bend in Owings Mills. The couple had been dating for about two years. Hill drove up to his residence at 10:30 p.m. on October 15th. When Hill began to climb the steps to his apartment, a man who "had a cut across his face[,]" came running up

behind him. A second man who was wearing a mask and was in possession of a handgun also approached Hill.

The masked man put a gun to his head and told Hill to give him his keys. After Hill did so, he was handcuffed and then hit in the back of his head with a gun.

The two strangers walked to Hill's apartment where one of the men unlocked the front door and Hill, accompanied by the two men, entered the apartment. Once they were inside the apartment, Melanie M., who was dressed in a long nightshirt, came out of the bedroom whereupon one of the intruders pointed a gun at her.

The men handcuffed Melanie M. and forced her to lay on the floor. The men kept saying that they were looking for $50,000, but Melanie M. told them that she and Hill did not have that amount of money. Hill, who was also forced to lay on the floor, stared at the unmasked intruder, which caused the man to warn Hill that if he kept staring at him he was going to be killed.

Hill and Melanie M. were next taken into the kitchen. The men then asked once again: "where was the $50,000." Hill told the gunmen that he was working for his uncle, who owned a bar, and was paid "under the table," but didn't make $50,000. He also said that the only money he had was on his person; which was "[a] hundred and some dollars[.]" The men took Hill's wallet and his gold chain.

The men next went into the bedroom, looked around, and repeatedly asked where the money was. They then looked for Hill's car keys, but could not find them. Melanie M. gave the men the keys to her car. The men put Hill in the bathroom, forced him to sit on the toilet, told him not to move, and closed the door.

From inside the bathroom, Hill heard another door close and believed that one of the men had left. He then heard Melanie M. "saying please don't rape me, please don't rape me." Hill also heard her struggling and crying and saying "I'm pregnant, I'm pregnant, if you're going to rape me, I have condoms in the bedroom."

Hill next heard Melanie M. and one of the men enter the bedroom. Hill who was still handcuffed, cracked the bathroom door to see that the intruders were no longer in the hallway and "eased out" of the bathroom and "peeked" into the bedroom where he "saw Melanie laying across the bed and a guy. . . was over top of her." The man had a gun laying on the

2

bed. Hill "eased past" the bedroom door, went out the front door, and ran down the steps.

He rang several doorbells (with his-forehead), but no one responded. He ran to an adjoining apartment building where a woman answered his ring. Hill told the woman that he and his girlfriend were being robbed and asked her to call the police. A few seconds after speaking with the woman, the man with the cut across his face was seen by Hill returning to the apartment building so Hill ran and hid in the woods.

Three leather coats, a Nintendo 64 game system, and a cordless telephone, along with Hill's money and gold chain, were taken from Hill's apartment by the robbers.

Hill recalled that on the date in question, but prior to the home invasion, he saw a man outside his apartment building "at the top of the hill . . . just standing out there the whole day." Hill added: "Every time I'd ride by, he was just standing out there." Hill estimated he drove in and out of the complex, where he lived, two or three times that day. From the man's location at the top of the hill, the man could see the entrance to Hill's apartment building. Hill testified that he did not know appellant on sight, but that he had heard of him because he (appellant) was the father of two of his cousin's children.

### B. Testimony of Melanie M.

At approximately 10:00 p.m., on October 15, 1998, Melanie M. returned home from her job at a food market. Later, she heard the door open and then saw two men, who were accompanied by Hill. Both men were black and were strangers. One of the men was wearing a mask. Hill's hands were handcuffed behind him and a second person, who was not-masked, was standing behind Hill and appeared to be holding onto him.

The rest of her testimony corroborated the testimony of Mr. Hill. Additionally, Melanie M. testified that she was raped by the masked gunman. She did not know appellant and could not identify the man who raped her.

Melanie M. was asked if she had ever dated appellant. She responded in the negative. She testified that during the time in question, she was faithful to Hill, and had never met appellant prior to the rape. In addition, the sheets on the bed on the date in question were clean because they were washed once a week. According to Melanie M., there was no reason, other

than the fact that she had been raped, for appellant's semen to be on her sheets.

### C. Testimony of Laura Pawlowski

Laura Pawlowski is an employee in the Baltimore County Police Department forensic laboratory's biology unit. Her job is to examine evidence to "determine if there are any body fluid stains, hairs, skin, [or] fibers on the items recovered from crime scenes." When such items are found, she must determine if the items are suitable for DNA analysis.

In 2002, which was approximately four years after Melanie M. was raped, Pawlowski screened the evidence recovered from the scene of the rape and, upon examining the bed sheet on the bed where the rape occurred, she "identified a semen stain on the sheet." Pawlowski explained that presently it is easier to make DNA identification than in 1998, because there now exists a Combined DNA Index System (hereinafter "CODIS"). She added:

> [i]f we have a case where there is no suspect, doing DNA in previous years would not have been helpful because we would not have had a name to link that up with. With the CODIS system we can take a crime scene sample where we have no suspect, generate a DNA profile, feed that profile into a computer and see if there's a known standard that will match it.

The sample that Pawlowski took from the sheet that covered the bed on which Melanie M. was raped was entered into the database in 2002, and "came back with" appellant's name on it. A new sample was later obtained from appellant, an analysis was completed on that sample, and it was again compared to the sample from the bed sheet. Once again the results were the same. The parties stipulated that the DNA from the semen sample on Melanie M.'s bed sheet was that of appellant.

### D. Other Evidence

Detective James Bonsall, who had investigated the incident in question in 1998, arrested appellant on December 31, 2004. Appellant was transported to a police station, where Detectives Bonsai and Shulter interviewed him. After being advised of the Miranda warnings, appellant agreed to make a statement without an attorney being present.

Detective Bonsall informed appellant of the 1998 rape and robbery, giving him the date, time, and location of the incident, as well as a general

description of the two victims. According to Detective Bonsall, appellant said "that he didn't recognize the location, that the names weren't familiar and that he had not participated in any robbery or any rape that had occurred during that period of time." Detective Bonsall then informed appellant that the DNA from the sheets where the rape had occurred matched appellant's DNA. Appellant "again said that he didn't have any involvement but did advise that he had had sex with a great many women over the years but that he had never had to rape a woman to get sex." The detective asked if appellant remembered having sex with Melanie M. Appellant did not have any such recollection but then said: "that it could have been a situation where he didn't get her name and then something happened after he left." Appellant concluded by saying that he could not explain how his DNA could have been at the rape scene.

### E. Evidence Presented by Appellant

Detective Gary Cross testified that after speaking with Hill on November 23, 1998, he put together a photographic array from which Hill failed to identify appellant, who had been included in the array.

Edward Foster ("Foster"), appellant's younger brother, was twenty-four years old at the time of trial. He testified that he had seen appellant and Melanie M. together at his mother's house around Valentine's Day in 1998. When his mother left, appellant asked Foster to be a look-out, while appellant took Melanie M. up to his bedroom. After an interlude, appellant's mother returned home and asked Foster where appellant was. Foster said he did not know. Appellant's mother went upstairs, and opened a bedroom door. Foster and his mother looked into the bedroom and Foster saw Melanie M. with appellant in the bed. Melanie M. was naked, according to Foster. He never thereafter saw Melanie M. until his brother's trial.

ECF No. 14, Ex. 8 at 1-7.

Petitioner's Motion for a New Trial was denied, and he was sentenced on March 27, 2006, to a life term of incarceration with other concurrent sentences. *Id*., Ex. 5 at 13-14.

Petitioner's counsel raised the following claims on direct appeal:

1. Did the lower court err by overruling Appellant's objection to the prosecutor's claim in rebuttal argument that defense counsel had suggested that "all young black males are drug dealers" and had appealed to racial prejudice?

5

> 2. Did the lower Court err by sustaining the prosecutor's objection to Appellant's question of the complainant about a prior similar incident in which Appellant had not been involved?
>
> 3. Did the lower Court err by overruling Appellant's objection to the DNA evidence because it was obtained by means of his being compelled to give a DNA sample while a prisoner in the Division of Correction?

ECF No. 14, Exs. 6-8.

On April 16, 2008, in an unreported opinion, the Court of Special Appeals affirmed Petitioner's judgment of conviction. *Id.*, Ex. 8. Petitioner did not seek further appellate review. ECF No. 1.

Petitioner instituted state post-conviction proceedings on April 6, 2009. ECF No. 14, Exs. 9-13. The petition, as supplemented, litigated, and construed by the court, alleged that:

> A. Trial counsel was ineffective for failing to:
>
> 1. Object to the trial court's instruction on reasonable doubt;
> 2. Object to the rape instructions;
> 3. Call an expert to testify regarding the victim's rape examination; and
> 4. Call a corroborating witness; and
>
> B. Appellate counsel was ineffective.

*Id*.

A hearing on Petitioner's claims was held on February 4, 2010. *Id.*, Ex. 12. In an Opinion and Order entered on February 22, 2010, post-conviction relief was denied. *Id.*, Ex. 13. Petitioner filed an application for leave to appeal the adverse findings of the post-conviction court, alleging only that his trial counsel was ineffective for failing to object to the trial court's instruction on reasonable doubt. *Id.*, Ex. 14. On August 10, 2011, the intermediate appellate court summarily declined to review Petitioner's case. *Id.*, Ex. 15.

In the instant Petition, Petitioner maintains that: (1) he was forced to give DNA evidence against himself; (2) the prosecutor made improper closing arguments; (3) he was denied the right to confront the victim; (4) trial counsel was ineffective in failing to: (a) object to an incomplete instruction regarding reasonable doubt; (b) request a lesser included instruction regarding second degree rape; (c) call an expert to testify with respect to the rape examination; and (d) call a corroborating witness regarding Defendant's relationship with the victim; and (5) Appellate counsel was ineffective for railing to raise a plain error challenge to the trial court's reasonable doubt instruction. ECF No. 1.

## Threshold Considerations

### Timeliness & Exhaustion of State Remedies

The Respondents do not contend, and the Court does not find, that the Petition was filed outside the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1). Further, Petitioner no longer has any state direct review or collateral review remedies available to him with respect to the claims raised herein; thus, his claims are exhausted for the purpose of federal habeas corpus review.

### Procedural Default

Before a petitioner may seek habeas relief in federal court, he must exhaust each claim presented to the federal court by pursuing remedies available in state court. *See Rose v. Lundy*, 455 U. S. 509, 521 (1982). This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); 28 U.S.C. § 2254(b)-(c). In Maryland, this may be accomplished by raising certain claims on direct appeal and with other claims by way of post-conviction

7

proceedings. Exhaustion is not required if at the time a federal habeas corpus petition is filed a petitioner has no available state remedy. *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989).

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U. S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U. S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481-82 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief).

The procedural default doctrine bars consideration of a claim in a petition for habeas corpus absent a showing of cause and prejudice or actual innocence. *See Murray*, 477 U.S. at 495-96; *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977). Even where a petitioner fails to show cause and prejudice for a procedural default a court must still consider whether it should reach the merits of the petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 314-15 (1995); *Bostick v. Stevenson*, 589 F.3d 160, 164 (4th Cir. 2009). The miscarriage of justice standard is directly linked to innocence. *Schlup*, 513 U.S. at 320-21. Innocence is not an independent claim; rather, it is the "gateway through which a habeas petitioner must pass" before a court may consider constitutional claims which are defaulted. *Id.* at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U. S. at 496.

Respondents maintain that all of Petitioner's claims, except the claim regarding trial

counsel's failure to object to the jury instruction regarding reasonable doubt, have been procedurally defaulted. This Court agrees. The record demonstrates that Petitioner did not present any of these claims to the highest state court capable of reviewing them. Petitioner did not file an application for writ of certiorari regarding any claims advanced on his direct appeal, thereby abandoning those claims. Additionally, the only claim raised in Petitioner's application for leave to appeal the denial of post-conviction relief was that regarding ineffective assistance of trial counsel in failing object to the reasonable doubt jury instruction. ECF No. 14, Ex. 14.

Petitioner was provided an opportunity to explain why these claims should not be found to have been procedurally defaulted. ECF No. 15. Petitioner responded; however, he presented arguments only as to the merits of his claim regarding ineffective assistance of counsel in failing to object to the reasonable doubt jury instruction. ECF No. 19. Petitioner has offered nothing which would allow this Court to find that the procedurally defaulted claims should be considered and, therefore, the Court finds all claims, except the claim regarding ineffective assistance of counsel for failure to object to the reasonable doubt instruction, defaulted.

### Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). This "highly deferential" standard is "difficult to meet." *Cullen v. Pinholster*, 563 U.S. __, ___, 131 S.Ct. 1388, 1398 (2011); *Harrington v. Richter*, 562 U.S._, ___131 S. Ct. 770, 786 (2011).

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d).

A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 785 (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Further, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)). "[A] federal habeas court may not issue the writ

simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett,* 559 U.S 766, 773 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*.

## Analysis

When a Petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id*. at 696. Claims alleging ineffective assistance of appellate counsel, as alleged here, are analyzed under the *Strickland* standard. *See Smith v. Robins*, 528 U.S. 259, 285 (2000).

As the Supreme Court held in *Strickland*, "a state court conclusion that counsel rendered effective assistance of counsel is not a finding of fact binding on the federal court to the extent stated by [former] 28 U.S.C. § 2254(d)[now § 2254(e)(1)]." *Strickland*, 466 U.S. at 698. Rather, "[a]lthough state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254[(e) (1)] . . . both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* It follows, then, that new § 2254(d)(1) applies to the state court's conclusion that the Petitioner's trial counsel rendered effective assistance of counsel and this Court may not grant relief on this claim as long as the state court denied the claim based on a reasonable application of the *Strickland* standard to the facts presented in the state court proceeding.

Petitioner alleges that trial counsel was ineffective for failing to object to the jury instruction concerning reasonable doubt. ECF No. 1. During his state post-conviction proceedings, Petitioner argued that the reasonable doubt instruction given in his case was deficient because it did not include the following sentence from the Maryland Criminal Pattern Jury Instruction: "However, if you are not satisfied of the Defendant's guilt to that extent, then reasonable doubt exists and the Defendant must be found not guilty." *See* ECF No. 14, Ex, 9 at 7; Ex.12. Petitioner's claim relied on the Maryland Court of Appeals' decision in *Ruffin v. State*, 906 A.2d 360 (2006). He did not offer any additional evidence or testimony in support of his claim, rather he simply relied on the ruling in *Ruffin,* which was decided after the conclusion of Petitioner's trial and given only prospective application by Maryland courts.

In *Ruffin*, the Court of Appeals considered a preserved challenge to a reasonable doubt

12

instruction that omitted language from the Maryland Criminal Pattern Jury Instruction similar to the language that was omitted in Petitioner's reasonable doubt instruction and involving the same trial judge. *Id*. at 362-63. The appellate court announced a change in Maryland law which required trial courts to follow the Maryland Pattern Jury Instruction on reasonable doubt without substantial deviation. *Id*. at 371. The *Ruffin* Court specifically noted that "we shall hold that, as a matter of non-constitutional Maryland criminal law, in every criminal jury trial, the trial court shall instruct the jury utilizing the Maryland Criminal Pattern Jury Instruction on the presumption of innocence and proof beyond a reasonable doubt. MPJI-CR2:02." *Id*. at 365.

In rejecting Petitioner's claim, the post-conviction court found that trial counsel could not be ineffective for failing to foresee changes in Maryland law, which *Ruffin*[1] clearly represented. ECF No. 14, Ex. 13, at 2-4; *see Kornahrens v. Evatt*, 66 F.3d 1350, 1360 (4th Cir. 1995); *Honeycutt v. Mahoney*, 698 F.2d 213, 217 (4th Cir. 1983). Additionally, the post-conviction court found that Petitioner had failed to establish that trial counsel did not have strategic reasons for proceeding with the instructions as issued by the court. Trial counsel did not testify during the post-conviction proceeding and post-conviction counsel informed the court that he would not call trial counsel to testify because doing so would not benefit Petitioner's post-conviction case. ECF No. 14, Ex. 12 at 4-14. Additionally, Petitioner has failed to demonstrate any prejudice arising from the conduct of trial counsel. *See, e.g., Fields v. Attorney General of Maryland*, 956 F.2d 1290, 1294-99 (4th Cir. 1992) (petitioner bears the burden of establishing deficient advice and prejudice). The factual findings of the state court are supported by the record. Given the

---

[1] The *Ruffin* court stated, "Our holding in this case represents a change in a Maryland common law principle and not an overruling of prior cases on the ground that they were erroneously decided. Consequently, the defendant Ruffin is entitled to the benefit of our holding, but, otherwise, the holding shall be applied only prospectively. In other words, today's holding "applies to the instant case[ ] ... and to all [criminal] trials commencing and trials in progress on or after the date this opinion is filed." *Id*. at 371 n.7 (citations omitted).

limited review available in this Court, the state post-conviction court's rejection of this claim of ineffective assistance of counsel shall not be disturbed. *See* 28 U.S.C. § 2254(d).

## **Conclusion**

The record establishes, and this Court determines, that Petitioner is not entitled to federal habeas relief. There is no basis upon which to find constitutional deficiencies in the state court proceedings, and Petitioner has failed to rebut the presumption of correctness of the findings of fact underlying the rejection of his grounds for post-conviction or appellate relief. For the foregoing reasons, the Petition shall be denied.

Additionally, a Certificate of Appealability is not warranted. A Certificate of Appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a Certificate of Appealability shall be denied. *See* 28 U.S.C. § 2253(c)(2). Accordingly, the Petition shall be dismissed with prejudice and a Certificate of Appealability shall not issue. A separate Order follows.

Date: <u>November 26, 2013</u>　　　　　　　　　　　　<u>　　　　　/s/　　　　　</u>
　　　　　　　　　　　　　　　　　　　　　　　ROGER W. TITUS
　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE